AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

**15 NOV 10 PM 2: 51**

CLERK-ALBUQUERQUE

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>LG MODEL LS660 CELLULAR TELEPHONE, SERIAL<br>NUMBER 502CYEA1075788 | )<br>)<br>)  Case No.  15mr730<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attchment A

located in the _____ State and _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code,<br>Sections 841(a)(1) and (b)(1)<br>(A) | Possession with Intent to Distribute 1 kilogram and more of Heroin and 500 grams<br>and more of a mixture or substance containing Methamphetamine |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Ryan Breen, Special Agent HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: November 10, 2015

_____
*Judge's signature*

**KAREN B. MOLZEN**
**U.S. MAGISTRATE JUDGE**
*Printed name and title*

City and state:  Albuquerque, New Mexico

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF LG
MODEL LS660 CELLULAR TELEPHONE,
SERIAL NUMBER 502CYEA1075788,
CURRENTLY LOCATED AT 5441
WATSON DRIVE SE, ALBUQUERQUE,
NM 87106

Case No. _____

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Ryan N. Breen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     Your Affiant makes this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     Your Affiant has been employed by the Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) since December 26, 2010.  Prior to employment with ICE/HSI, your Affiant was employed as a Federal Air Marshal stationed in both Boston, Massachusetts and as an Instructor for Federal Air Marshals in Artesia, New Mexico from May 2002 to December 2010.  Your Affiant has also been employed as a Border Patrol Agent with United States Border Patrol stationed in Alamogordo, New Mexico from August 1997 to May 2002.  During that time your Affiant was assigned as the Prosecutions Officer for the Alamogordo Station and as Task Force Officer

assigned to the Drug Enforcement Administration in Las Cruces, New Mexico.  Your Affiant is

currently assigned to the Office of the Assistant Special Agent in Charge, Albuquerque, where it

is your Affiant's primary duty to investigate individuals involved in the violations of Title 18,

United States Code, Section 841

3.      Your Affiant has received extensive training and practical experience pertaining

to federal criminal procedures, federal criminal statutes, United States Immigration and

Nationality law, United States Customs laws and regulations, and other federal and state laws

pertaining but not limited to: the importation and distribution of controlled substances, bulk cash

smuggling, money laundering, asset forfeiture, firearms, and conspiracy.  Your Affiant is

authorized, and presently assigned to investigate violations of the Comprehensive Drug Abuse

and Prevention and Control Act of 1970, Title 21, United States Code, Section 801, et seq, Title

18 United States Code, Section 922 and other violations of federal law.  Your Affiant has

successfully completed twelve weeks of Criminal Investigator training at the Federal Law

Enforcement Training Center (FLETC).  In addition, your Affiant completed twelve weeks of

Special Agent training with HSI, also at FLETC.  Your Affiant has also acquired knowledge and

information about such offenses, and the various means and methods by which they are furthered

from numerous sources, including formal and informal training from other law enforcement

officers, investigators, and Special Agents; interviews of informants and arrestees; and

interviews of other knowledgeable individuals.

4.      Based on your Affiant's training and experience, your Affiant is familiar with

matters including, but not limited to, the means and methods used by persons and drug

2

trafficking organizations (DTO) to purchase, transport, and distribute illegal drugs and to hide profits generated from those transactions.

    a. Drug traffickers often conceal names, addresses, telephone numbers, email addresses, or other pertinent codes and/or contact information for their current or past illegal drug source(s) of supply, customers, or criminal associates in the electronic memory of their cellular telephones.

    b. Drug traffickers often conceal photographs of drugs, vehicles, locations, or photographs of drug associates in the electronic memory of their cellular telephones.

    c. Drug traffickers often communicate with their illegal source(s) of supply, customers, or criminal associates by text messaging and/or email from their cellular telephones.  Accordingly, pertinent texts and/or email messages are often stored in the electronic memory of their cellular telephones.

    d. Drug traffickers must maintain and have quick access to large amounts of United States currency or other liquid assets in order to maintain and finance their ongoing drug business. As such they often store bank account information, drug ledgers, or lists of where assets are stored in the electronic memory of their cellular telephones.

    5.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of your Affiant's knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.      The property to be searched is a LG MODEL LS660 CELLULAR TELEPHONE, SERIAL NUMBER 502CYEA1075788, hereinafter the "Device."  The Device is currently located at 5441 WATSON DRIVE SE, ALBUQUERQUE, NM 87106.

7.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8.      On or about October 8, 2015 Officers from the New Mexico State Police were conducting traffic interdiction operation on Highway 40 Eastbound near Albuquerque, New Mexico.  During this time, Sgt. Arcenio Chavez of the New Mexico State police observed a silver passenger car traveling eastbound and overtaking traffic.  Sgt. Chavez tracked the vehicle through a radar gun and noted that the vehicle was doing 80 mph in a 75 mph zone.  Sgt. Chavez proceeded to stop the vehicle and make contact with the driver.

9.      As Sgt. Chavez spoke with the occupants of the vehicle he was told by the driver that she did not have a driver's license. Sgt. Chavez also noticed that the passenger's hands, later identified as using the alias Daniel Torres-Mora, were visibly shaking as he attempted to look for the paperwork for the vehicle in the glove box. As Sgt. Chavez was handed an insurance card he could hear Torres mumbling as he tried looking for the registration. Sgt. Chavez stated that based on his training and experience this behavior indicated neither of these occupants were the owner

4

of the vehicle. Sgt. Chavez asked the driver if she could step back to ~~my~~ his patrol unit where he normally conducted traffic stops.

10.     While back at his patrol unit Sgt. Chavez wrote the citation for speeding. The driver was verbally identified as Neely Green. Sgt. Chavez conducted a query on her name and date of birth and was shown her driver's license was not valid.  In explaining the speeding violation, Green stated she said she knew she was speeding and thought motorists were allowed to drive a few miles over the speed limit. During general conversation Green said they had traveled to Phoenix, Arizona to visit the passenger's brother for a few days. Sgt. Chavez found the registration and insurance for the vehicle showed different names.  The Colorado Registration showed the vehicle being registered to Platas Garcia Baldo, the insurance showed the vehicle being registered to Juan Carlos Brambila. Sgt. Chavez asked Green who the vehicle belonged to and she stated a friend named Carlos and that's all she knew.  Sgt. Chavez asked Green if he could return to the vehicle and check VIN numbers on the dash and driver door. Green said it was ok.

11.     While checking the VIN numbers on the vehicle Sgt. Chavez spoke to the passenger Torres who stated they had travelled to Arizona to visit family.  Torres also stated that the vehicle belonged to Carlos but that he did not know who the owner was.  Sgt. Chavez noted that Torres' behavior was still nervous and shaky.   After the issuance of the citation for speeding Sgt. Chavez returned all documentation to Green at which point she turned and walked back to her vehicle.  Based on his training and experience, as well as the above articulable facts, Sgt. Chavez believed the occupants were involved in criminal activity.

5

12.     Sgt. Chavez called out to Green, who was walking back to her vehicle, and asked her if he could ask her some questions. Green turned around and walked back to Sgt.'s Chavez' vehicle. Green clarified that they went to visit Torres' brother but did not know his name. When Sgt. Chavez asked Green what the passenger's brother name is, Green said, "I don't know." Green said they stayed with the brother at his apartment.

13.     Sgt. Chavez returned to the vehicle and spoke with Torres and asked to see his driver's license again.  The passenger removed his wallet and showed his driver's license identifying him as Daniel Torres-Mora. Sgt. Chavez could see the driver's license shaking in Torres' hand. Torres said they had gone to Phoenix, Arizona for two days and while there they visited his uncle and his brother. Sgt. Chavez asked Torres-Mora who the owner of the vehicle was and Torres said "a friend's" but was not sure who really owned the vehicle and it could possibly be a girl.

14.     Sgt. Chavez asked Green if there were any weapons, large amounts of money, marijuana, cocaine, methamphetamine, or heroin in the vehicle. Green said no to each. Sgt. Chavez reported he could see a change in Green's behavior when he asked about drugs. Sgt. Chavez also reported he could hear a change in Green's voice when asked about cocaine, methamphetamine, and heroin. Sgt. Chavez asked Green if he could search the vehicle. Green said he would need to ask the passenger first.

15.     Sgt. Chavez asked Torres if there were any weapons, large amounts of money, marijuana, cocaine, methamphetamine, or heroin in the vehicle. Torres said no to each. Sgt. Chavez reported seeing a distinct change in Torres' behavior when asked about drugs. When asked about cocaine, methamphetamine, and heroin Sgt. Chavez stated Torres looked down and away three times.  Sgt. Chavez asked Torres to search the vehicle.  Torres read the New Mexico Department of Public Safety Consent to Search form in Spanish. Torres said he did not want the vehicle searched. Sgt. Chavez explained to Torres he was going to deploy his K-9 to the exterior of the vehicle. Sgt. Chavez patted Torres down for weapons and asked him to stand near the right away fence.

16.     Sgt. Chavez stated that as he explained to Green that he was going to deploy his canine to the exterior of the vehicle she became very uncomfortable and he could see a change in her breathing.

17.     Sgt. Chavez deployed his canine Wesley who is trained to detect the odors of marijuana, cocaine, methamphetamine and their derivatives to the exterior of the vehicle. Canine Wesley was certified by California Canine Narcotics Association on September 4, 2015. Upon deploying canine Wesley, Sgt. Chavez reported Wesley alerted to the exterior of the vehicle and crawled under the rear bumper. Also Wesley alerted at the open window and entered the vehicle on his own.  While in the vehicle Wesley alerted to several items.

18.     Sgt. Chavez placed Canine Wesley back into his vehicle and as he approached Green he was informed by Officer Ron Wood that Green had something to tell. Green explained

7

she was a heroin user and she had a small amount of heroin in the vehicle which her boyfriend did not know about. She said she has been trying to hide her addiction from him. Green said the heroin was in her purse and she could get it for the officers.

19.     With the assistance of Bernalillo County Deputy Leonard Armijo, Sgt. Chavez spoke to Torres about the canine alert and what his girlfriend stated. Torres said he knew she had a small amount of heroin in the vehicle and he could get it for the officers. Torres still said he did not want the officers to search the vehicle. Chavez and Armijo explained to Torres they would be applying for a search warrant for the vehicle and began walking back towards their patrol units. Torres reached into the car and pulled back the floor mat and said, "Look there it is." Sgt. Chavez stated he could see a plastic bindle lying on the floorboard containing some type of substance.

20.     The vehicle was towed to the New Mexico State Police office in Albuquerque and secured for a search warrant. A preliminary interview of Green conducted by NMSP Agent Steven Farmer. Green stated she knew there were a pound of heroin and a pound of methamphetamine in the vehicle.

21.     At this time Sgt. Lorenzo Aguirre contacted Homeland Security Investigations Albuquerque New Mexico to assist in the investigation. Special Agents arrived at the NMSP barracks and Special Agent (SA) Jody Harrison was the lead Special Agent in the investigation.

22.     SA Harrison and SA Brett Finn utilized a portable fingerprint analysis machine to identify TORRES as Jose BARBA-Flores, a citizen and national of Mexico. Taskforce Officer

8

David Romero and NMSP Agent Eric Moya conducted an interview of BARBA in Spanish and BARBA made the following statements.

23.     BARBA stated that he was given the purple grocery bag in the Walmart parking lot in Phoenix Arizona.  BARBA stated that he was approached to take a bag from Phoenix Arizona to Denver Colorado and that he was going paid $2000.00 for doing so.  BARBA admitted that he looked into the purple bag in which the drugs were kept and that he looked at the bundles of narcotics.  BARBA stated there were five packages in the purple grocery bag.  BARBA stated that he was going to take the drugs to a man named Panicado in Denver Colorado and that he had met him previous times to do this.

24.     The drugs were weighed and field tested at the Homeland Security Investigations Office.  Two of the bundles field tested a presumptive positive for heroin and weighed approximately 2008.95 grams.  The remaining three bundles field tested a presumptive positive for methamphetamine and weighed approximately 1635.64 grams.  Based on training and experience your Affiant knows that this amount is consistent with distribution.

25.     The Device is currently in the lawful possession of the Department of Homeland Security, Homeland Security Investigations (HSI).  It came into HSI's possession in the following way:  The Device was seized incident to BARBA-Flores' arrest. At that time BARBA-Flores stated the Device was not his and that it had been left in the vehicle that he was driving.  BARBA-Flores claimed to not know who the phone belonged to, though at the time of arrest it was fully charged and appeared to have been receiving phone calls during the trip from Phoenix. Though BARBA-Flores abandoned this property, Your Affiant seeks this warrant out

9

of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

26.     The Device is currently in storage at 5441 WATSON DRIVE SE, ALBUQUERQUE, NM 87106.  In your Affiant's training and experience, your Affiant knows that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of HSI.

## TECHNICAL TERMS

27.     Based on training and experience, your Affiant uses the following technical terms to convey the following meanings:

a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

11

      d.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28.     Based on training, experience, and research, your Affiant knows that the Device has capabilities that allow it to serve as a wireless telephone, a digital camera, a PDA, and is capable of accessing the internet.  Through training and experience, your Affiant knows examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29.     Based on knowledge, training, and experience, your Affiant knows that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

30.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file)..

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

13

31.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, your Affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

33.     Your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Ryan N. Breen
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on:

UNITED STATES MAGISTRATE JUDGE

14

## ATTACHMENT A

The property to be searched is a LG MODEL LS660 CELLULAR TELEPHONE, SERIAL NUMBER 502CYEA1075788, hereinafter the "Device."  The Device is currently located at 5441 WATSON DRIVE SE, ALBUQUERQUE, NM 87106.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.      All records on the Device described in Attachment A that relate to violations of

Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A) and involve Jose Francisco

BARBA-Flores since October 8, 2015, including:

     a.   lists of customers and related identifying information;

     b.   types, amounts, and prices of drugs trafficked as well as dates, places, and

        amounts of specific transactions;

     c.   any information related to sources of drugs (including names, addresses, phone

        numbers, or any other identifying information);

     d.   any information recording Jose Francisco BARBA-Flores schedule or travel from

        October 8, 2015 to the present;

     e.   all bank records, checks, credit card bills, account information, and other financial

        records.

2.      Evidence of user attribution showing who used or owned the Device at the time

the things described in this warrant were created, edited, or deleted, such as logs, phonebooks,

saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that

can store data) and any photographic form.